UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2016 MAR -3  AM 10: 37

CLERK
BY _____
DEPUTY CLERK

WENDY L. JESTINGS, individually and )
JESTINGS FINANCIAL GROUP, PLLC, )
                                   )
    Plaintiffs and Counterclaim        )
    Defendants,                        )
                                   )
    v.                                 )    Case No. 5:14-cv-00238
                                   )
SCOTT G. CHRISTENSEN, individually )
and as Manager of CHRISTENSEN      )
FINANCIAL GROUP, LLC, THE          )
NORTHWESTERN MUTUAL LIFE           )
INSURANCE COMPANY, d/b/a           )
NORTHWESTERN MUTUAL                )
FINANCIAL  NETWORK,                )
                                   )
    Defendants and Counterclaim        )
    Plaintiffs.                        )

**OPINION AND ORDER**
**(Docs. 49 & 50)**

    Massachusetts Mutual Life Insurance Company ("MassMutual") has filed an assented-to
Motion to Intervene in this action.  (Doc. 49.)  It also moves to clarify or modify the final
judgment and for an order barring Defendant and Counterclaim Plaintiff Northwestern Mutual
Life Insurance Company ("Northwestern") from accessing MassMutual's confidential
information.  (Doc. 50.)  A hearing was held on January 28, 2016, at which time the court took
the motions under advisement.  For the reasons that follow, MassMutual's Assented-to Motion
for Intervention (Doc. 49) is GRANTED, and MassMutual's Motion to Clarify or Modify the
Final Judgment and for an Order Barring Northwestern Mutual from Accessing MassMutual's
Confidential Information (Doc. 50) is GRANTED in part and DENIED in part.

## I.     Background

### A.     Underlying Facts of Instant Action

In November 2014, Wendy Jestings, an independent sales agent with MassMutual, filed a complaint against her former employer, Northwestern.  She also filed suit against Scott Christensen, a Northwestern managing partner, and Christensen Financial Group, LLC, a Northwestern general agency (collectively, "Christensen").  Jestings alleged, among other things, unlawful behavior in connection with her previous employment, breach of contract, defamation, and gender discrimination.

In April 2015, Northwestern and Christensen filed answers and counterclaims alleging that Jestings, prior to terminating her relationship with Northwestern, violated her fiduciary obligations by secretly recruiting for MassMutual all but one of the sales agents who worked with her at Northwestern.  Northwestern and Christensen claimed that Jestings and her team collected and misappropriated substantial amounts of Northwestern policyowner and client data by emailing and downloading the data to external hard drives "to facilitate a raft of improper life insurance replacements" upon their termination with Northwestern.  (Doc. 54 at 8.)  In its counterclaims, Northwestern stated that it intended to explore, through discovery, the identities and tactics of any individuals who acted in concert with Jestings.  (Doc. 19 at 34, 51–52, 54.)

On April 16, 2015, the court signed a Confidentiality Stipulation and Order (the "Protective Order").  (Doc. 27.)  The Protective Order permitted the parties to designate certain materials as "confidential" so long as the propounding party had a good faith belief "that the unrestricted disclosure of such information could be potentially prejudicial to [its] business or operations," "could infringe upon [its] proprietary interests" or its "reasonable confidentiality or privacy interests," or could violate a law or regulation.  (*Id.* at 2.)  After being designated "confidential," the Protective Order mandated that such materials:

> [S]hall not be disclosed by the receiving party to anyone other than persons authorized to receive such Confidential Information by the terms of this Order and, in any event, shall not be used for any purpose other than in connection with this litigation, unless and until such designation is removed either by written agreement of the parties, by stipulation of the parties on the record during a deposition, or by order of the Court.

2

(*Id.* at 6.)  The only individuals authorized to receive the confidential materials were the parties, counsel, consulting or testifying experts, and certain specified company employees, technical personnel, and stenographic and clerical employees who were associated with the parties and involved in this action.

### B.    Forensic Agreement

Though MassMutual was not a party to this action, the parties recognized during discovery that discoverable information would likely contain MassMutual's confidential information.  Such discoverable information existed on certain computers and electronic storage devices that Jestings and others with whom she worked had used during their employments at both Northwestern and MassMutual (the "Target Computers").

Prior to signing any agreement regarding the anticipated review of the Target Computers, Jestings' counsel revisited the possibility of settlement.  Northwestern explained that any settlement must include terms calling for the complete review of the Target Computers. Jestings' counsel stated that he would have to consult with MassMutual before reaching such an agreement. (Doc. 54-8.)  On July 29, 2015, MassMutual agreed to enter into a "Forensic Review and Confidentiality Agreement" (the "Forensic Agreement") to facilitate discovery with counsel to the parties involved in the instant action.  (Doc. 50-3.)

The Forensic Agreement provided that Setec Investigations ("Setec"), an outside vendor, would obtain mirror images of the Target Computers.  Thereafter, Setec would perform three tasks on the Target Computers and provide any resulting materials to outside counsel for Northwestern and Christensen and counsel of record for MassMutual and Jestings.  First, under ¶ 2 of the Forensic Agreement, Setec would provide: 1) "a report detailing instances of potential Northwestern Mutual Confidential Data transfers, copying, possession, or use" on the Target Computers, and 2) "the underlying data and documents referenced in that report" (collectively, "¶ 2 files").  (*Id.* at 2.)

Second, under ¶ 3 of the Forensic Agreement, Setec would perform tasks related to the production and review of emails residing on the Target Computers.  Setec would provide the parties with a spreadsheet containing header information (including attachment names and subject fields) for emails existing on the Target Computers, identifying any potentially privileged

emails.  With respect to non-privileged emails dated August 26, 2014 or later, Setec would provide all relevant parties with the underlying files (collectively, "¶ 3 files").[1]

Finally, under ¶ 4 of the Forensic Agreement, Northwestern and Christensen were required to provide Setec, MassMutual, and Jestings with a list of search terms and parameters "for the purpose of identifying potentially relevant documents and information beyond what has been identified through ¶¶ [2 and 3]." (*Id.*)  MassMutual would have ten days to review and object to the scope of the search terms and parameters.  Once objections were resolved, Setec would perform a search using the agreed-upon terms and then provide "a log containing the document titles, metadata and other identifying information for such documents sufficient to identify the results of the search" and "as for emails, a spreadsheet reflecting the header information (including attachment names and subject field)" with potentially privileged emails identified (collectively, "¶ 4 files").  (*Id.* at 4–5.)

After Setec provided the parties with all of these files, MassMutual had ten days to review and flag the materials for enhanced confidentiality protections.  Specifically, MassMutual could challenge the production of any file by asserting that it both (1) contained confidential information *and* (2) was not germane to the claims or counterclaims asserted in the action and therefore not discoverable.  Such an objection would have the effect of designating the file as "Challenged Data."  (*Id.* at 3.)  During the ten-day review period, all materials would be reviewed only by outside counsel for Northwestern and Christensen (the "outside counsel's eyes only" restriction).  If any item was designated as "Challenged Data," MassMutual or Jestings were required to provide opposing counsel with "the legal and factual basis" for the challenge that was "sufficiently detailed to permit Northwestern Mutual, Christensen, and the Court to evaluate such contentions" prior to the expiration of the ten-day review period.  (*Id.*)  The "outside counsel's eyes only" restriction would be extended as long as necessary to resolve any disputes over MassMutual's "Challenged Data" designations.  Any objected-to data that was thereafter determined to be confidential and irrelevant to the claims and counterclaims, either consensually by the parties or through court order, would remain permanently subject to the

---

[1] Jestings was terminated from Northwestern on August 25, 2014.  As part of Northwestern's standard termination procedures, all of the Target Computers were wiped clean on her last day of employment.  Accordingly, the Target Computers would only reflect emails sent or received after that date.

"outside counsel's eyes only" restriction and would not be produced to Northwestern or Christensen.

Conversely, files that contained MassMutual's confidential information but *were* relevant to allegations asserted in the action were discoverable. Accordingly, if these items were not designated as "Challenged Data" within the ten-day review period, they would not be subject to the "outside counsel's eyes only" restriction once the review period expired.[2] However, if disputes arose regarding the discoverability of these materials, they would remain subject to the "outside counsel's eyes only" restriction until such disputes were resolved.

### C.     Settlement of Instant Action

On August 2, 2015, Jestings agreed to dismiss her claims. The term sheet agreement she signed on that date called for the "[p]erformance of all obligations under the [Forensic Agreement] which shall continue after, and notwithstanding, the dismissal of the action . . . ." (Doc. 54-5 at 3.) Jestings reaffirmed her obligation to perform all obligations under the Forensic Agreement in the parties' comprehensive and final settlement agreement, which incorporated by reference the August 2, 2015 term sheet agreement.

 On August 13, 2015, the parties submitted a stipulation of settlement to the court, attaching a proposed final judgment. (Doc. 47.) On August 18, 2015, the court entered the stipulated final judgment, and the action was dismissed with prejudice. (Doc. 48.)

The final judgment included a provision regarding the "Certification of Destruction of Confidential & Proprietary Data." (*Id.* at 2.) This provision stated, among other things, that:

> Jestings shall proceed with the imaging and forensic examination pursuant to the terms and conditions of the [Forensic Agreement] previously signed and executed by Jestings and Northwestern Mutual, such examination to proceed notwithstanding the dismissal of the claims and counterclaims in this action.

(*Id.*) Jestings was also required, upon request, to certify that she had taken reasonable steps to identify and destroy any confidential or proprietary information belonging to Northwestern.

_____

[2] These files would still, however, be subject to the protections afforded by the Protective Order.

MassMutual was not a party to the settlement agreement and it did not consent to the stipulated final judgment.

### D.     Post-settlement Developments

On October 13, 2015, Northwestern sent an email to Jestings' counsel, advising that the first reports of the ¶ 2 files contemplated by the Forensic Agreement had been generated, and Setec was ready to proceed with the next step.  Northwestern requested a list of Jestings' attorneys so that potentially privileged emails could be screened before production of ¶ 3 files. Jestings' counsel responded that day, copying his co-counsel, and provided Northwestern with the requested names and email addresses of Jestings' various attorneys.  MassMutual was unaware of these communications.

On November 4, 2015, a MassMutual paralegal received messages from Northwestern suggesting that Setec was continuing to conduct a full review of the Target Computers.  On November 10, 2015, Setec provided 24 Excel files to counsel for each of the parties to the Forensic Agreement, including MassMutual.  The 24 Excel files listed all documents, files, folders, metadata, non-privileged emails, calendar entries and other Outlook files contained on the Target Computers.  In total, the 24 Excel files contained 1,015,246 rows of data.

On November 13, 2015, counsel for MassMutual sent a letter to counsel for Northwestern, stating that it objected to any further discovery of the Target Computers except for the purpose of identifying and returning Northwestern's confidential information.  In response, counsel for Northwestern argued that the final judgment permitted Northwestern to continue its discovery under the Forensic Agreement as it would have during litigation.

On November 25, 2015, counsel for MassMutual and Northwestern spoke by phone and attempted to resolve the pending dispute.  Later that day, Setec delivered a large volume of data to counsel for MassMutual, Jestings, Northwestern, and Christensen.  The data included:

> 1)   A report consisting of six Excel spreadsheets containing 432,233 rows of data, with 2,327 rows highlighted to reflect metadata information for documents identified by Setec as purported instances of "potential Northwestern Mutual Confidential Data transfers, copying, possession, or use."

2) Electronic documents (¶ 2 files), that purportedly corresponded to the above-mentioned highlighted rows.  There were, however, 2,327 rows highlighted and only 2,435 documents produced.

3) Nonprivileged emails, calendar entries, and other Outlook files (¶ 3 files).  However, there were 42,846 files provided, which did not match the number of ¶ 3 files listed on spreadsheets previously provided by Setec (43,106).

(Doc. 50-2 at 3; Doc. 50-9 at 5.)

On December 10, 2015, counsel for MassMutual sent another letter to counsel for Northwestern, stating that MassMutual had only consented to the Forensic Agreement for purposes of conducting discovery while litigation was pending.  Given that the action was settled and dismissed, MassMutual believed that there was no basis for continued discovery.  While MassMutual stated that it would participate in a reasonable process for identifying, segregating, and protecting any confidential information of Northwestern's that remained on the Target Computers, it objected to the production of any other files.  MassMutual also stated that it had begun to review the documents, emails, and other Outlook files provided by Setec, but its review was hindered by the manner and format in which Setec provided the documents.[3]  Accordingly, it instructed Northwestern not to release the spreadsheets, data, and documents beyond "outside counsel's eyes only" until its objections were resolved.  (Doc. 50-9 at 2.)

The next day, December 11, 2015, Northwestern responded to MassMutual's letter and rejected the assertion that Northwestern was required to refrain from continuing discovery or producing the disputed materials beyond "outside counsel's eyes only."  Because additional steps needed to be taken before confidentiality designations could be made to the ¶ 2 files, Northwestern advised MassMutual that it was willing to extend the "outside counsel's eyes only" restriction for just that type of data.  However, Northwestern rejected any similar extension of

---

[3] Specifically, MassMutual alleges that: (1) Setec "provided an unreasonably large volume of documents, in an unwieldy format"; (2) Setec's criteria for identifying instances of Northwestern's confidential data were "unreasonably overinclusive"; (3) Setec "did not provide any unique identifying numbers or other method for mapping its spreadsheets" to the underlying data, which affected MassMutual's ability to track documents designated as confidential; (4) "[t]he number of rows in Setec's spreadsheet, which supposedly identified all documents on the Target Computers, did not correspond to the number of documents that MassMutual . . . received"; and (5) the report failed to provide a basis for why each item constituted Northwestern's confidential information, as required by the Forensic Agreement.  (Doc. 50-1 at 15–16; Doc. 50-9 at 5–7.)

the "outside counsel's eyes only" restriction for the ¶ 3 files, and implied that these emails and Outlook files were no longer being held subject to the restriction because none of them had been timely designated by MassMutual as "Challenged Data."

Subsequently, Northwestern confirmed that some emails containing confidential information belonging to MassMutual had been provided to Northwestern's in-house counsel and businesspeople, but asserted that no email meeting the definition of "Challenged Data" had been shared (meaning, any confidential email shared was germane to the allegations asserted in the action). Northwestern did advise that there were certain emails it believed MassMutual had "been remiss in failing to designate as confidential, such as information concerning MassMutual policyowners who are not former [Northwestern] policyowners and who thus have not been embroiled in the improper replacement activity." (Doc. 50-16 at 2.) Because these ¶ 3 files would have likely met the definition of "Challenged Data" had they been timely designated as such, Northwestern advised that it would not disseminate them to Northwestern's in-house counsel and businesspeople. Northwestern also agreed to refrain from disclosing any of the ¶ 3 files to third parties while MassMutual continued to make confidentiality determinations, but alleges that, as of the date of the instant motions, MassMutual has not availed itself of this opportunity.

Since filing the instant motions, MassMutual has reviewed many of the ¶ 3 files. It alleges that some contain MassMutual materials that are "highly confidential, constitute MassMutual's trade secrets, and would be highly valuable to a company seeking to compete with MassMutual for customers and insurance agents." (Doc. 50-1 at 17.) Until the motions are resolved, Northwestern has agreed not to provide any additional files beyond the "outside counsel's eyes only" restriction and that any documents already provided to Northwestern's in-house counsel and businesspeople will not be accessed or reviewed.

## II. Analysis

### A. Intervention

MassMutual seeks to intervene in this action "for the limited purpose of preventing the actual and wrongful misappropriation of its confidential information and the abuse of an Order of

this Court by [Northwestern]." (Doc. 49-1 at 1–2.)  Northwestern has assented to MassMutual's intervention.

Rule 24 of the Federal Rules of Civil Procedure provides two means by which an applicant may intervene in an action: intervention as a matter of right and permissive intervention. *See* Fed. R. Civ. P. 24(a), (b).  Post-judgment intervention is "generally disfavored because it usually creates delay and prejudice to existing parties." *See United States v. Yonkers Bd. of Educ.*, 801 F.2d 593, 596 (2d Cir. 1986).  However, here, Northwestern has assented to and explicitly asked this court to grant MassMutual's intervention so that the instant matter can be resolved.  Accordingly, the court grants MassMutual's Motion for Intervention for its limited stated purpose.

### B.   Clarification or Modification of Final Judgment

MassMutual argues that post-dismissal discovery is not appropriate in this case and that, even if it were, Northwestern has wrongfully misappropriated MassMutual's confidential information in ways not authorized by this court's final judgment.  It seeks an Order:

(1) Memorializing Northwestern Mutual's agreement not [to] access any documents or information obtained from the Target Computers, and to keep such materials on an "outside counsel['s] eyes only" basis, pending resolution of this dispute;

(2) Ordering that all post-dismissal discovery in this action shall cease, except as further ordered by this Court;

(3) Clarifying or modifying the Final Judgment in this action to provide that the "forensic examination" described in the Final Judgment shall be conducted only for the purpose of identifying Northwestern Mutual confidential information, if any, that may be contained on the Target Computers and not for the purpose of conducting general post-dismissal discovery;

(4) Permitting MassMutual to take limited discovery for the purpose of determining the nature and extent of the distribution [of] information from the Target Computers to Northwestern Mutual and the forensic analyses that Northwestern Mutual has conducted on the Target Computers; and

(5) Requiring that the Target Computers, and all images or copies thereof, shall be returned to Jestings.

(Doc. 50 at 2.)

Northwestern argues that none of this relief is appropriate.  It contends that the post-dismissal discovery, conducted in accordance with the terms of the Forensic Agreement, is explicitly permitted by both the settlement agreement and the final judgment.

Under Rule 60(b) of the Federal Rules of Civil Procedure, the district court "may relieve a party . . . from a final judgment, order, or proceeding" in five enumerated circumstances, or for "any other reason that justifies relief."  This subpart represents "a grand reservoir of equitable power to do justice in a particular case" and, if appropriate, should be "liberally applied."  *United States v. Cirami*, 563 F.2d 26, 32 (2d Cir. 1977) (citation omitted).  However, the Second Circuit has held that a "proper case" for invocation of this subpart is present only "where there are extraordinary circumstances" or "where the judgment may work an extreme and undue hardship."  *Matarese v. LeFevre*, 801 F.2d 98, 106 (2d Cir. 1986) (citations omitted).  The court finds that the post-dismissal discovery in this case presents extraordinary circumstances sufficient to revisit the final judgment and clarify its terms.  In so doing, the court notes that there is little precedent governing the particular circumstances presented by the pending motions.

### 1.  Terms of the Final Judgment

MassMutual argues that, at most, the language and intent of the final judgment permit Northwestern to engage in post-dismissal discovery of Northwestern's confidential data in ¶ 2 files.  It contends that the final judgment did not intend to permit Northwestern to proceed with the email review provided for in ¶ 3 of the Forensic Agreement or the search term review provided for in ¶ 4 of the Forensic Agreement.

As an initial matter, the court notes that it adopted all provisions of the parties' stipulated and proposed order when entering final judgment.[4]  The underlying contractual basis for the parties' proposed order was a comprehensive settlement agreement that plainly conditioned dismissal upon Jestings' performance of "*all* obligations" under the Forensic Agreement (emphasis added).  (Doc. 54-6 at 11.)  Accordingly, the proposed final judgment unqualifiedly required Jestings to "proceed with the imaging and forensic examination *pursuant to the terms and conditions of the* [*Forensic Agreement*]" (emphasis added).  (Doc. 48 at 2.)  The court did

---

[4] Despite foreseeing obvious risks to its confidentiality interests and bargaining for a protocol to safeguard its data, MassMutual chose not to intervene in this case before final judgment was entered.  Had it done so, it would have been able to timely object to the proposed injunction.

not intend to limit or alter the terms of the parties' bargained-for settlement agreement when approving their proposed order.

Moreover, that the final judgment uses the phrase "forensic examination" in its order cannot be interpreted so narrowly as to only apply to ¶ 2 files under the Forensic Agreement. The Forensic Agreement's full name is the "*Forensic Review* and Confidentiality Agreement," but also indisputably governs the discovery of ¶¶ 3 and 4 files (emphasis added). There are no separate agreements entitled "Email Review and Confidentiality Agreement" and "Search Term Review and Confidentiality Agreement." Additionally, the fact that the final judgment also requires Jestings to certify her return of all of Northwestern's confidential data does not, by itself, write ¶¶ 3 and 4 out of the Forensic Agreement, or limit the injunction's requirement that Jestings comply with the "terms and conditions" (rather than "¶ 2") of the Forensic Agreement.

The parties also argue that the intent underlying the proposed final judgment supports their respective positions. For example, in support of its motion, MassMutual submits a declaration from Jestings' counsel, Timothy J. Ervin, who was involved in negotiating the proposed final judgment. Attorney Ervin states that, from his perspective, the final judgment was intended only to apply to the review set forth in ¶ 2 of the Forensic Agreement and "[t]he purpose of the forensic examination described in the Final Judgment was to identify any confidential client information belonging to Northwestern Mutual and any other proprietary materials owned by Northwestern Mutual . . . ." (Doc. 50-23 at 2–3.)

However, declarations submitted by counsel for both Northwestern and Christensen dispute this claim and contend that Northwestern was always "adamant that the settlement must include a comprehensive forensic review as set forth in the [Forensic Agreement]" and communicated as much to Jestings' counsel "on multiple occasions." (Doc. 54-15 at 2; *see also* Doc. 54-1 at 4.) Additionally, Attorney Ervin's current representations are undermined by the fact that the proposed final judgment was conditioned upon a settlement agreement that his client signed while under his representation, which, in clear and unambiguous terms, explicitly required Jestings' "[p]erformance of *all obligations* under the [Forensic Agreement]" (emphasis added). (Doc. 54-6 at 11.) Moreover, had Attorney Ervin truly intended for post-dismissal discovery to only apply to ¶ 2 files, he could have asked for more specificity in the proposed final judgment when negotiating its terms and before submitting it to the court.

It is also not clear why MassMutual believes Northwestern's confidential data would only be found pursuant to ¶ 2 of the Forensic Agreement. Confidential client information and proprietary materials belonging to Northwestern might also be found through the review provided for by ¶¶ 3 and 4.[5] MassMutual's concern that much of its confidential policyowner information will be shared with Northwestern if ¶¶ 3 and 4 files are produced is lessened by the fact that the Forensic Agreement only permits the discovery of data related to a limited group of MassMutual policyowners: those who were targeted by the alleged replacement pitches challenged in this action. The confidential data of the majority of MassMutual policyowners, not being relevant to the claims or counterclaims of this case, remain outside the bounds of permissible discovery.

In sum, the final judgment authorizes post-dismissal discovery of ¶¶ 2, 3, and 4 files under the Forensic Agreement. Such discovery does not amount to "general post-dismissal discovery," as maintained by MassMutual. Northwestern is *only* entitled to proceed with the computer review and file production called for under the existing Forensic Agreement.

## 2. Implications of Settlement Agreement on MassMutual

In the alternative to its argument regarding the import of the final judgment, MassMutual argues that the post-dismissal discovery at issue here is not appropriate because the Forensic Agreement was only intended to apply while this action was pending, and MassMutual cannot be bound to the terms of the settlement agreement without having been a party to it. The court recognizes that "a contract cannot bind a nonparty," *E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002), and "[s]ettlement agreements are not to be used as a device by which A and B, the parties to the decree, can (just because a judge is willing to give the parties' deal a judicial

---

[5] MassMutual argues that the majority of ¶ 3 files are dated after Jestings joined MassMutual and therefore are unlikely to contain Northwestern's confidential information. However, many of the non-email Outlook files are dated before Jestings joined MassMutual. Moreover, emails sent after Jestings left Northwestern could still contain Northwestern's confidential information. Setec confirmed that external storage devices had been connected to the Target Computers. (Doc. 54-16 at 4.) If Jestings and her team downloaded Northwestern's confidential information to external hard drives, as alleged by Northwestern, then this confidential information could have been transferred back onto the Target Computers and discussed or attached via email after Jestings began working for MassMutual.

imprimatur) take away the legal rights of C, a nonparty." *Davis v. Blige*, 505 F.3d 90, 102–03 (2d Cir. 2007) (internal quotation marks and citation omitted).

Here, however, the settlement agreement takes no rights away from MassMutual, but only requires MassMutual to continue with its existing obligations under the Forensic Agreement, a contract to which it was a party and that it played a pivotal role in developing. While the court agrees that the better course of action would have been for Northwestern to directly inform MassMutual about the terms of the settlement agreement before submitting the proposed final judgment to the court, it recognizes that MassMutual was instrumental in securing the very review to which it now objects. Northwestern is not seeking discovery of different types of data or attempting to commit an end run around a previously established protocol. Rather, it seeks the production of the same data, governed by the same agreement and subject to the same confidentiality protections, as previously negotiated by MassMutual to adequately protect its confidentiality interests.

The fact that the settlement agreement envisioned the review occurring *after* entry of final judgment does not, on its own, change the court's conclusion. A party's right to discovery does not necessarily end once judgment has been entered. *See GATX Corp. v. Appalachian Fuels, LLC*, Civil Action No. 09-41-DLB, 2011 WL 4015573, at *1–5 (E.D. Ky. Sept. 9, 2011) (post-judgment discovery did not breach settlement agreement where agreement expressly provided for such discovery); *Wilkinson v. F.B.I.*, 922 F.2d 555, 557 (9th Cir. 1991) (overruled on other grounds) (affirming without criticizing post-judgment discovery arising out of "settlement agreement [that] provided for the release of all claims against appellees in exchange for their production of thousands of pages of documents"). Disclosure obligations developed in the course of litigation can live on after an action has concluded. Here, as the terms of the Forensic Agreement were previously deemed sufficient by MassMutual to protect its asserted confidentiality interests, the court does not believe a post-dismissal discovery process that follows the exact same terms is unfair. Moreover, the Forensic Agreement does not expressly provide that its terms are only valid while litigation is pending.

### 3.  Ownership of Data on Jestings' Computer

MassMutual also contends that because the information on the Target Computers "belongs" to the company, it cannot be produced without its consent.  MassMutual's claimed ownership of the disputed data, however, does not by itself impede Northwestern's ability to compel production from Jestings.  Under normal principles of discovery, "parties may request from their adversaries documents (including [Electronically Stored Information]) 'which are in the possession, custody or control of the party upon whom the request is served.'"  *In re NTL, Inc. Sec. Litig.*, 244 F.R.D. 179, 195 (S.D.N.Y. 2007) (quoting Fed. R. Civ. P. 34(a)).  "The concept of 'control' has been construed broadly."  *Id.* (citation omitted).  "'[C]ontrol' does not require that the party have legal ownership or actual physical possession of the documents at issue; rather, documents are considered to be under a party's control when that party has the right, authority, or practical ability to obtain the documents from a non-party to the action."  *Id.* (citation omitted); *see Golden Trade, S.r.L. v. Lee Apparel Co.*, 143 F.R.D. 514, 525 (S.D.N.Y. 1992) (courts have "interpreted Rule 34 to require production if the party has the practical ability to obtain the documents from another, irrespective of his legal entitlement to the documents").  "No restrictions, per se, exist to limit the discovery of documents relating to third parties where such material is not privileged."  *Johnson Mach. Co., Inc. v. Kaiser Aluminum & Chem. Corp.*, Civil Action No. 85-3200, 1985 WL 4007, at *2 (E.D. Pa. Nov. 26, 1985).

Here, irrespective of ownership of the information, it is undisputed that Jestings was required to provide Northwestern with access to the contents of her computers pursuant to her discovery obligations in this case.  The contents of her computer and all of the information found therein were within her possession, custody, and control within the meaning of Rule 34 and typical discovery principles.  *See In re Bankers Tr. Co.*, 61 F.3d 465, 469–71 (6th Cir. 1995) (where party had possession, custody, or control over non-party's documents, such documents were subject to discovery even though non-party retained legal ownership of them).

Moreover, Jestings' contract with MassMutual permitted her disclosure of this information if ordered to do so by a court.  (Doc. 50-21 at 8.)  The court did just that when approving the Forensic Agreement and the proposed final judgment.

### 4.  Ten-Day "Outside Counsel's Eyes Only" Restriction

The court remains mindful that this case presents the unusual circumstance of a settlement agreement providing for the post-dismissal discovery of a third party's information. The court has broad discretion and authority to exercise its equitable powers to protect a party's rights and fashion injunctive relief as appropriate to protect those interests. *See Springs Mills, Inc. v. Ultracashmere House, Ltd.*, 724 F.2d 352, 355 (2d Cir. 1983) (noting that "[a] district court has a wide range of discretion in framing an injunction in terms it deems reasonable to prevent wrongful conduct"); *Ives v. W.T. Grant Co.*, 522 F.2d 749, 764 (2d Cir. 1975) ("Equity decrees are to be applied flexibly to fit the needs of each situation.").

As of this date, MassMutual has yet to designate a single file as "Challenged Data." Though the Forensic Agreement provides for only a ten-day "outside counsel's eyes only" restriction, equity requires this period to be extended for a couple of reasons.  First, given its purported lack of knowledge of the settlement agreement, MassMutual was reasonable in questioning whether discovery could lawfully continue post-dismissal and whether it remained obligated to make such designations.  Second, though MassMutual knew when approving the ten-day review period that this case would result in the production of an immense volume of files, it could not have reasonably anticipated the ways in which its review would be hindered by technical problems.[6]  Accordingly, the court agrees that MassMutual should be allotted more time to examine the data in question and make "Challenged Data" or "confidential" designations.[7]  This is particularly true since Northwestern has represented to MassMutual that it believes some of the materials provided by Setec include ¶ 3 files that MassMutual was remiss in failing to designate as "confidential."

---

[6] The court notes the declaration of Michael Kunkel, the Director of Investigative Services of Setec, which states that "[t]he format of the data Setec delivered to MassMutual and its counsel presents no impediment to reviewing those files and designating them as confidential." (Doc. 54-16 at 6.) Kunkel contends that any issues MassMutual faced were likely a result of its own actions when loading the data into its review platform. (*Id.*)  Regardless of where the fault lies, the court believes that MassMutual faced unanticipated technical difficulties that made reviewing the voluminous number of files within ten days unreasonable.

[7] Under the Forensic Agreement, the parties reserved "the right to seek to negotiate or obtain by Court order different or additional protections than contemplated by this Agreement." (Doc. 50-3 at 5.)  The Forensic Agreement also provides that its terms may be modified by court order.

Accordingly, as for the ¶ 3 files, Northwestern is ordered to return all emails and other Outlook files that have been disclosed to its in-house counsel and businesspeople to "outside counsel's eyes only" temporarily.  MassMutual will have thirty (30) days from entry of this order to complete its review of all ¶ 3 files and designate any as "Challenged Data" or otherwise "confidential," including those which were previously disseminated beyond outside counsel's eyes.[8]

As for the ¶ 2 files, the court understands that the parties need to take some additional steps before any confidentiality designations can be made.  Accordingly, MassMutual will have thirty (30) days from the date that these steps are completed to designate the ¶ 2 files as "Challenged Data" or "confidential."

Finally, MassMutual will have ten (10) days from entry of this order to supply Northwestern with specific objections to any of the previously provided search terms pursuant to ¶ 4 of the Forensic Agreement.  Once the parties agree on the scope of the terms, Setec will run the corresponding search.  Thereafter, MassMutual will have thirty (30) days from the date Setec supplies the ¶ 4 files to designate any as "Challenged Data" or "confidential."

These expanded review periods will give MassMutual a more reasonable amount of time to flag files containing non-discoverable policyowner information, trade secrets, and proprietary strategy documents,[9] without posing any prejudice to Northwestern.  Whereas during rapidly evolving litigation an "outside counsel's eyes only" restriction might be a substantial impediment to attorney-client communications, this case is inevitably moving on a different timeline post-dismissal.[10]

---

[8] The Protective Order also permits a party to label already-produced items "confidential," if it, through inadvertence, failed to appropriately mark them as such previously.  (Doc. 27 at 10.)

[9] Though Northwestern submits MassMutual had months to review Jestings' emails because duplicates resided on MassMutual's own servers, the court finds that MassMutual acted reasonably in waiting to start its review until November 25, 2015, when Setec first identified which ¶ 3 files were relevant.

[10] Northwestern did not even initiate the review until almost three months after the Forensic Agreement went into effect, undermining any suggestion that its completion is a matter of great urgency.

The court reminds MassMutual that the Forensic Agreement requires any "Challenged Data" or "confidentiality" designations to be accompanied "with the legal and factual basis for such contentions, sufficiently detailed to permit [Northwestern] . . . and the Court to evaluate such contentions." (Doc. 50-3 at 3.) If disputes arise about a file's designation, any item that has been designated as "Challenged Data" must remain subject to "outside counsel's eyes only" and any item designated as "confidential," must be treated as confidential until the dispute has been resolved. The parties are ordered to consult in good faith to resolve any dispute without the assistance of the court. The court will not consider the dispute unless and until the parties provide written certification of their good faith efforts to resolve it. These efforts should be detailed in an affidavit, which includes: (1) a certification of good faith efforts, (2) a list of unresolved issues and the reasons therefor, and (3) the dates of consultations, the names of the participants, and the length of time of the conferences (if any). The court orders that all disputes regarding "Challenged Data" or "confidential" designations be resolved within twelve months of entry of final judgment, or August 18, 2016.

### 5.   Use of Produced Documents in Other Litigation

The court reminds the parties that the Protective Order, which "survive[d] the termination of this action," does not permit documents designated as "confidential" to be used in other litigation. (Doc. 27 at 6, 10, 12.) *See In re Peters*, 642 F.3d 381, 393–94 (2d Cir. 2011) (counsel's submission of protected materials in second action violated protective order where order only permitted use of such information in "this action"); *In re Biovail Corp. Sec. Litig.*, 247 F.R.D. 69, 70 (S.D.N.Y. 2007) (party willfully violated protective order by using documents and information obtained through third party subpoenas in second action where order in first action stated that such materials were to be used "solely for the prosecution or defense of this Action").

Northwestern cites to *In re Parmalat Securities Litigation*, 258 F.R.D. 236 (S.D.N.Y. 2009), to argue that because its counterclaims were not initiated for an improper purpose (namely, as a pretext to obtain discovery for other lawsuits), it can use data retrieved from the Target Computers in other litigation. However, the court in *Parmalat* stated that, as a threshold matter, the plaintiffs would not be able to use non-public information obtained in that action in other pending lawsuits "without modification of the existing Protective Order," which protected

all materials, whether designated confidential or not. *Id.* at 245.  The court stated that *if* the plaintiffs could make use of the documents produced in that action, presumably by modifying the existing protective order, doing so in another case in a foreign jurisdiction with less permissive discovery rules would not, by itself, be sufficient to establish good cause for "continued *blanket confidential treatment* for the challenged documents." *Id.* at 246 (emphasis added).  The Protective Order in the instant case is distinct from the one in *Parmalat*, only providing confidentiality protections to documents specifically designated as "confidential."  Until otherwise modified, it explicitly does not permit such items to be "used for any purpose other than in connection with *this litigation*, unless and until such designation is removed either by written agreement of the parties, by stipulation of the parties on the record during a deposition, or by order of the Court" (emphasis added).  (Doc. 27 at 6.)  Northwestern must continue to adhere to these explicit terms and cannot use items designated as "confidential" in other ligation unless approved by the parties or the court.

The Protective Order does, however, draw a distinction between a party's voluntary use of confidential documents to develop evidence in conjunction with another case and a party's obligation if served with compulsory process to produce such materials in another action.  In the latter circumstance, the Protective Order permits production only if the compelled party provides the required notice to the party who designated the information "confidential," and that party has not sought protection from, or filed objections to, the production of the designated materials with this court or another appropriate forum.  (*Id.* at 8.)  That the Protective Order provides for a way to address compulsory process does not mean it authorizes Northwestern to affirmatively use "confidential" information for its own benefit, even if germane to other litigation.

Therefore, presently and until served with legal process, the value to Northwestern in continuing with discovery does not extend to other litigation.  Northwestern's counterclaims sought both compensatory and equitable relief, the latter motivated by a stated desire to better protect its interests and policyowners from harm associated with the recruiting and replacement activities alleged against Jestings.  The permitted post-dismissal discovery may provide Northwestern with information regarding who was responsible for committing the acts alleged, what tactics were employed, and how Northwestern can better protect its interests in the future.

### C.    MassMutual's Request for Discovery

In its motion, MassMutual asks the court for leave to conduct limited discovery to determine what ¶ 3 files Northwestern distributed beyond "outside counsel's eyes only."  It argues that such discovery is necessary to determine the extent of any confidentiality breaches that may have already occurred.

The court denies this request.  First, MassMutual does not have a right to know which specific emails Northwestern deemed worthy of sharing with its in-house counsel and businesspeople or the strategic reasons for those determinations.  More importantly, the request is now moot.  The relief provided by the court requires Northwestern to return all emails back to the "outside counsel's eyes only" restriction.  Upon request, Northwestern is also required to provide MassMutual with written certification that it completed this task.

### D.    Returning Target Computers and Images

MassMutual also requests an order that the Target Computers, and all images or copies thereof, be returned to Jestings.  At this point in time, the Target Computers have been returned, but Northwestern maintains their images.  The Protective Order requires only that information designated as "confidential" be returned to the propounding party upon request within ninety days after the final termination of this action.  However, here, MassMutual did not receive any data from Setec until November 25, 2015, which represents the earliest date by which MassMutual could begin designating items as "confidential."  At that time, however, the 90-day window provided for in the Protective Order had already expired.

Naturally, then, this window must be extended.[11]  The court therefore modifies the second sentence of ¶ 17 of the Protective Order to read as follows:

> Within thirty (30) days after the conclusion of the post-dismissal discovery, Counsel and the parties shall, upon request of the Propounding Party, return all Confidential Information to the Propounding Party.

(Doc. 27 at 12.)  The remaining provisions in ¶ 17 remain in effect.

---

[11] The Protective Order provides that the court "may modify the terms and conditions of this Order for good cause, or in the interest of justice, or on its own order at any time in these proceedings."  (Doc. 27 at 14.)

III.    **Conclusion**

MassMutual's Assented-to Motion for Intervention (Doc. 49) is GRANTED, and MassMutual's Motion to Clarify or Modify the Final Judgment and for an Order Barring Northwestern Mutual from Accessing MassMutual's Confidential Information (Doc. 50) is GRANTED in part and DENIED in part.

Post-dismissal discovery in this action must continue as provided for in this order.

Dated at Rutland, in the District of Vermont, this 3rd day of March, 2016.

_____
Geoffrey W. Crawford, Judge
United States District Court